IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,

v.

CRIMINAL ACTION NO.
1:11-CR-00522-WBH-LTW
1:11-CR-00113-WBH-LTW

FREDERICK CADET,

Defendant.

## MAGISTRATE JUDGE'S FINAL REPORT AND RECOMMENDATION AND ORDER CERTIFYING CASE READY FOR TRIAL

This matter is presently before the Court on Defendant Frederick Cadet's Motion to Suppress Search Warrant at 387 Sawgrass Way, Fayetteville, Georgia 30215. (No. 1:11-cr-00113-WBH-LTW, Docket Entries [46] and [67]; No. 1:11-cr-00522, Docket Entry [8]). For the reasons set forth below, the undersigned **RECOMMENDS** that Defendant Frederick Cadet's Motion to Suppress Search Warrant at 387 Sawgrass Way, Fayetteville, Georgia 30215 be **DENIED**. (No. 1:11-cr-00113-WBH-LTW, Docket Entries [46] and [67]; No. 1:11-cr-00522, Docket Entry [8]).

## I.     BACKGROUND

On March 15, 2011, a federal grand jury charged Defendant Frederick Cadet with one count of making a false statement in an application for a U.S. passport and one count of making a false claim to U.S. citizenship in violation of 18 U.S.C. §§ 911 and 1542. (No. 1:11-cr-00113-WBH-LTW, Docket Entry [11]). Rigaud Cadet, Defendant's

brother and co-Defendant, was charged with the same two offenses in separate counts and has since pled guilty to making a false statement in an application for a U.S. passport. (Id.; see also No. 1:11-cr-00113-WBH-LTW, Docket Entry [44]).

## A. **Defendant Applies for a Passport**

On August 3, 2009, Frederick Cadet ("Defendant") applied for a passport in his own name at a Fayetteville, Georgia post office. (February 7, 2012 Hearing Transcript ("Tr."), 7-9). For identification, Defendant used a Georgia driver's license issued in his own name and a (fraudulent) Wisconsin birth certificate. (Tr. 7-8). Defendant took an oath administered by the passport acceptance clerk, swearing that the information in the application was true. The passport acceptance clerk made a copy of Defendant's driver's license and returned the original to Defendant. (August 24, 2012 Hearing Transcript ("Tr1."), 76-77). The passport acceptance clerk gave Defendant the top copy of the passport application, which serves as a receipt. (Tr. 11).

## B. **Defendant's Passport Application Is Investigated**

Upon submission for processing, Defendant's passport application was flagged by the Fraud Prevention Manager. (Tr. 16). No passport was issued on Defendant's application. (Tr. 9). Instead, on September 25, 2009, Consular Affairs referred Defendant's passport application to Special Agent Harlin Bryant for investigation. (Tr. 34). Special Agent Bryant had a tremendous backlog of cases and does overseas protection that requires him to be gone for forty-five to sixty days at a time. (Tr. 36) Consequently, Special Agent Bryant did not immediately begin to investigate

2

Defendant's passport application. (Id.)

Once the investigation was underway, Special Agent Bryant contacted the Wisconsin Department of Vital Statistics and learned that the birth certificate Defendant submitted was a fraudulent document and no one by Defendant's name had been born during the year indicated on Defendant's birth certificate. (Tr. 15). Special Agent Bryant also learned that Defendant was more than likely not born in the United States because Defendant's mother had completed an application petitioning for Defendant's U.S. citizenship and stated that Defendant was born in Haiti.[1] (Tr. 17).

Based on the investigation findings, Special Agent Bryant was interested in locating evidence to corroborate Defendant's birth in Haiti. (Tr. 18). Specifically, Special Agent Bryant was interested in locating a Haitian birth certificate, which would show that Defendant actually was a citizen of Haiti; a Haitian passport, which would show that Defendant was a national of Haiti; or any other documents that would show exactly where Defendant was from and his citizenship status. (Tr. 18-19). Special Agent Bryant also wanted to locate the original Wisconsin birth certificate Defendant presented with his application because in his experience investigating these types of cases, individuals under investigation will say that they were not the ones who went into the passport office, even when confronted with a passport application bearing their

---

[1] At the time of the search warrant, Special Agent Bryant had not located Defendant's mother, who was presumably in Haiti. (Tr. 18).

3

picture.[2] (Tr. 17). Special Agent Bryant was interested in finding other applications Defendant made bearing his signature for purposes of comparing the handwriting on the passport application. (Tr. 19-20). Special Agent Bryant was interested in finding travel records, which would have proved where Defendant was coming from and when he came to the United States. (Tr. 20). Although Special Agent Bryant had been able to obtain some school records for Defendant, they were inconclusive on establishing when Defendant came to the United States. (Tr. 30). In the end, Special Agent Bryant was trying to "put the pieces together": "Is the birth certificate overlooked? Is it a true birth certificate? Is the driver's license actually him? Is this person who they say they are?" (Tr. 20).

In addition, based on Special Agent Bryant's years of experience, he was interested in determining whether Defendant might have submitted other passport applications, since he was denied a passport based on the August 3, 2009 application. (Tr. 16). Special Agent Bryant conducted a search of the Consolidated Consular Database and determined that Defendant did not have another passport under his own name. (Tr. 21). However, this search could not detect whether Defendant had obtained a passport under a different name. (Tr. 21).

---

[2] In this case, Special Agent Bryant also was investigating Rigaud Cadet, Defendant's brother, for the same offenses. (Tr. 15). Rigaud Cadet, like Defendant, applied for a passport at the same Fayetteville, Georgia post office. (Tr. 15). In Rigaud Cadet's case, a passport was issued. (Tr. 15-16). According to the Government, Rigaud Cadet denied he was the individual who went into the post office to apply for the passport, even as late as his plea colloquy. (Tr. 26).

AO 72A
(Rev.8/82)

## C.   Obtaining a Search Warrant for Defendant's Residence

Based on the address Defendant provided on his passport application, as confirmed through property searches and hours of surveillance, Special Agent Bryant determined that 387 Sawgrass Way was Defendant's permanent residence. (Tr. 12-13). Defendant's probation officer also confirmed that she had made contact with Defendant at the residence. (Tr. 13).

Special Agent Bryant obtained an arrest warrant for Defendant on February 16, 2011. (Tr. 11). At the time Special Agent Bryant obtained the arrest warrant, he had not found the receipt for the passport application Defendant submitted. (Tr. 12, 43-44). Special Agent Bryant believed the receipt for the passport application would be in Defendant's permanent residence. (Tr. 12). As of the date of the search of Defendant's residence, Special Agent Bryant also had not found the original Wisconsin birth certificate used in connection with Defendant's passport application. (Tr. 14-15). Special Agent Bryant believed that the original Wisconsin birth certificate would be in Defendant's permanent residence. (Tr. 16-17). Special Agent Bryant did have possession of a copy of the Wisconsin birth certificate that Defendant submitted to the State Department in response to a request for more information concerning his passport application. (Tr. 15).

As is customary, Special Agent Bryant collaborated with local law enforcement to apprehend Defendant and search his residence. (Tr. 43). To prepare the search warrant affidavit, Clayton County Investigator Joshua Waites met with Special Agent

5

Bryant to discuss the results of Special Agent Bryant's investigation, and Investigator Waites conducted surveillance on Defendant's residence, Rigaud Cadet's (Defendant's brother and co-Defendant) residence, and the barber shop on Tara Boulevard where both Defendant and Rigaud Cadet were believed to be working. (Tr. 53). During the surveillance, Investigator Waites observed Defendant cutting hair. (Tr. 53-54). However, a search of state licensing records did not produce a barber's license for Defendant. (Tr. 54). Additionally, Investigator Waites was concerned that Defendant's Georgia driver's license had been fraudulently obtained because usually a birth certificate is used to obtain a driver's license. (Tr. 59).

On February 17, 2011, Investigator Waites applied for a search warrant for Defendant's residence at 387 Sawgrass Way, (Docket Entry [50-1]), along with the barbershop and Rigaud Cadet's residence, a third location. As part of the search warrant application, Investigator Waites prepared a sworn affidavit describing (1) his authority to apply for a search warrant under Title 35 of the Official Code of Georgia; (2) his four to five years of experience in law enforcement; (3) the location of the house in which Defendant lived, its address, and with an inserted photograph, its appearance; (4) the things to be seized ("documents relating to Forgery, False Statement, fraudulently obtained social security cards, birth certificates, passports and Georgia drivers licenses"); and (5) the Georgia law Defendant was suspected of violating (O.C.G.A. § 16-9-2, Forgery). (Id.)

To establish probable cause that Defendant lived at 387 Sawgrass Way,

Investigator Waites noted in the affidavit that: (1) Defendant lists that as his address in his monthly reports to his Fayette County probation officer; (2) the probation officer had visited the address within the last six months; (3) residents had verified that Defendant lived there; (4) Defendant listed the Sawgrass address on his Georgia driver's license when he renewed it on September 1, 2010; and (5) Defendant's uncle Michel Cadet owns the house. (Id.) In further support of a probable cause showing, the affidavit stated that: (1) Special Agent Bryant had federal arrest warrants for both Rigaud Cadet and Defendant under 18 U.S.C. § 1542 (false statement in a U.S. passport); (2) Special Agent Bryant had relayed that Defendant used a Georgia driver's license to apply for the U.S. passport at the Fayetteville post office on August 3, 2009; (3) the "Wisconsin Department of Health Services" had determined that the Wisconsin birth certificate used by Defendant to apply for the passport was fraudulent based on its appearance and the lack of corresponding birth records; and (4) State Department records showed that Defendant was born in Haiti in 1975, and that he had overstayed a visa issued to him in the 1990's. (Id.) Lastly, the search warrant notes that "[f]or the above reasons" probable cause existed that the house contained evidence of both state and federal crimes, including forgery, and that the evidence sought included "Driver's License, Passport, Birth Certificates and Visas." (Id.)

Investigator Waites presented the Affidavit and Application for a Search Warrant in the Superior Court of Clayton County, Georgia. (Id.) Investigator Waites signed and swore to the Affidavit before the issuing judge in the Superior Court of Clayton County.

7

(Id.) The issuing judge signed the Affidavit and Search Warrant, and filled in the time and date. (Id.) The search warrant contained no limitation as to time of day. (See id.) The issuing judge included a no-knock provision because of Defendant's previous history of resisting arrest. (Tr. 55-58).

### D. The Search of Defendant's Residence

On the same evening, around midnight, teams of federal and state agents set up outside the three locations. (Tr. 58). One team executed a search warrant at the barber shop, where they found and arrested Defendant and his brother, Rigaud Cadet. When Defendant was arrested, he had a Georgia driver's license on his person that appeared to be the same one used to apply for the passport. (Tr. 47). A second team searched 1868 Deer Crossing Way, Rigaud Cadet's residence. A third team executed the search warrant for 387 Sawgrass Way. One of the female residents at the 387 Sawgrass Way residence pointed out a bedroom as Defendant's and as the place he kept his belongings. (Tr. 64). Inside the bedroom, the team found the Wisconsin birth certificate Defendant used to apply for his never-issued passport and the receipt from the passport application he filed at the post office. (Tr. 60). An unlocked and open safe in Defendant's bedroom contained the documents. (Tr. 68). Also found in Defendant's bedroom were a SKS assault rifle, one jar of green leafy material suspected to be marijuana, bags and scales. (Tr. 65, 68). Investigator Waites did not find a barber's license. (Tr. 61).

## II. LEGAL ANALYSIS

Defendant moves to suppress the search warrant for 387 Sawgrass Way on three

AO 72A
(Rev.8/82)

grounds.  First, Defendant argues probable cause for the search warrant was lacking because the lead law enforcement officer on the case had sufficient evidence prior to the search of Defendant's residence, and there was no allegation of continuing criminal activity by the Government.  Thus, there were no exigencies necessitating a search of the residence.  Second, Defendant contends that the language in the search warrant lacked the requisite specificity necessary to comply with Fourth Amendment standards.  Third, Defendant contends that the scope of warrant was overbroad because it allowed law enforcement officers to search the entire residence, even though Defendant did not own the residence and there were other individuals who resided in the home.

## A.    <u>Probable Cause Supported the Search Warrant</u>

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.  In general, the search of private property, without proper consent, is unreasonable unless it is authorized by a valid search warrant supported by probable cause.  See <u>Camara v. Mun. Court of San Francisco</u>, 387 U.S. 523, 528-29 (1967). Probable cause is "a fluid concept–turning on the assessment of probabilities in particular factual contexts–not readily, or even usefully, reduced to a neat set of legal rules." <u>Illinois v. Gates</u>, 462 U.S. 213, 232 (1983).   Sufficient probable cause to support a search warrant exists when the totality of the circumstances allow a conclusion that there is a fair probability of finding contraband or evidence at a particular location. <u>United States v. Brundidge</u>, 170 F.3d 1350, 1352 (11th Cir. 1999).  For the search of a

9

residence, probable cause requires some nexus between the premises and the alleged crime. United States v. Bradley, 644 F.3d 1213, 1263 (11th Cir. 2011). The nexus between the objects to be seized and the premises searched can be established from the particular circumstances involved and need not rest on direct observation. Bradley, 644 F.3d at 1263. A police officer's expectation, based on prior experience and the specific circumstances of the alleged crime, that the evidence is likely to be found in a suspect's residence satisfies probable cause. Bradley, 644 F.3d at 1263-64. It is not necessary to find that the residence is a locus of the crime or for the agents to have procured specific evidence that relevant records would certainly be found there. Bradley, 644 F.3d at 1264.

To avoid warrants issuing without probable cause, the issuing magistrate "is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . . , there is a fair probability that contraband or evidence of a crime will be found in a particular place." Gates, 462 U.S. at 238; United States v. Miller, 24 F.3d 1357, 1361 (1994). "[P]robable cause deals 'with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" Gates, 462 U.S. at 231(internal citations omitted); Miller, 24 F.3d at 1361. "Courts reviewing the legitimacy of search warrants should not interpret supporting affidavits in a hypertechnical manner; rather, a realistic and commonsense approach should be employed so as to encourage recourse to the warrant process and to promote the high

10

level of deference traditionally given to magistrates in their probable cause determinations." Miller, 24 F.3d at 1361 (citing Gates, 462 U.S. at 236-37). A reviewing court's duty is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed. Gates, 462 U.S. at 238.

In this case, ample statements with the warrant affidavit support a finding that probable cause that evidence of a crime would be found in Defendant's residence existed. In particular, the warrant affidavit supports the notion that Defendant engaged in a crime, that evidence of the crime is capable of being hidden in Defendant's residence, and given the nature of the evidence involved, Investigator Waites reasonably concluded that such evidence should be expected to be found in Defendant's residence.

To begin, the warrant affidavit described a federal offense Investigator Waites believed Defendant committed–false statement in a passport application in violation of 18 U.S.C. § 1542. Investigator Waites noted that a federal arrest warrant had been issued for this offense, which signaled that a federal judge had found probable cause to believe Defendant had filed a fraudulent passport application. Based on Investigator Waites's statements within the affidavit, there was more than a fair probability that Defendant had used a fraudulent birth certificate in applying for the passport at a Fayetteville, Georgia post office. Investigator Waites was contacted by Special Agent Bryant, who relayed, in detail, facts concerning the passport offense, including the time and place the offense occurred, the nature of the documents related to the offense, and Special Agent Bryant's investigation of the offense, including follow-up with the

Wisconsin Department of Vital Statistics and a visa application Defendant's mother completed indicating that Defendant was born in Haiti.

Additionally, Investigator Waites's statements in the affidavit show a fair probability that Defendant may have had other fraudulently obtained identification documents, such as "fraudulently obtained social security cards, birth certificates, passports, and Georgia driver's licenses." Investigator Waites noted in the affidavit that "Frederick Cadet used a Georgia Drivers License #056486621 in the name of Frederick Cadet, date of birth 10/31/1975" with his passport application. Investigator Waites also noted that Defendant renewed his Georgia driver's license on September 1, 2010. The Georgia Department of Driver Services requires U.S. citizenship or proof of lawful presence in the United States to obtain or renew a driver's license. Given Defendant's apparent lack of U.S. citizenship, permanent residency, or a current, valid visa, it is reasonable to believe that Defendant's original and renewed Georgia driver's licenses were more likely than not fraudulent documents, acquired with other fraudulent documents, such as a fraudulent birth certificate, passport, or maybe even social security cards.

Investigator Waites's belief that he would find the passport application receipt, the original Wisconsin birth certificate, and other fraudulently obtained identification documents in Defendant's residence was supported by the nature of the documents. Certain types of documents, such as "passports, personal identification, and bank records are precisely the sorts of items which people tend to keep at home among their personal

12

papers and effects." <u>United States v. Freeman</u>, 685 F.2d 942, 949 (5th Cir. 1982). "They are also the sort which could be reasonably expected to be kept there for long periods of time." <u>Id.</u> at 952. Thus, there was more than a fair probability that Defendant would maintain his birth certificate, passport records, and social security cards indefinitely at his residence. <u>See, e.g.</u>, <u>United States v. Toumasian</u>, No. 1:10-cr-0291-TCB-JFK-3, 2011 WL 3798223, at *7 (N.D. Ga. July 19, 2011) ("One does not need Supreme Court precedent to support the simple fact that records of illegal business activity are usually kept at either a business location or at the defendant's home. Likewise, personal financial records are also usually stored at a person's home or place of business." (internal quotation marks and citations omitted)). It also was reasonable for the issuing judge to conclude that the existence of various fraudulent documents suggested that the means of making those identification documents, such as computers, printers, ledgers, forgery equipment, and government applications, would be located at Defendant's home. <u>See</u> <u>United States v. Khanani</u>, 502 F.3d 1281, 1290 (11th Cir. 2007) (concluding that under a "'common sense and realistic' interpretation" of the warrant affidavit, sufficient probable cause existed for the seizure of office computers pursuant to a warrant seeking evidence of immigration and tax fraud violations, even without fact-specific reasons to believe there were computers in the office or that the computers were used in the commission of a crime).

Lastly, based on Investigator Waites's statements in the affidavit, there was a fair probability that Defendant resided at 387 Sawgrass Way. Defendant's uncle owned the

13

residence at 387 Sawgrass Way. Defendant had consistently reported his place of residence as being 387 Sawgrass Way to his probation officer. Defendant's probation officer had been to the address within the last six months, and the residents confirmed that Defendant lived there. Defendant renewed his Georgia's driver's license on September 1, 2010, with the address 387 Sawgrass Way. Accordingly, the issuing judge properly found probable cause in support of the search warrant application.

Defendant challenges the search warrant because he contends it was obtained based on Special Agent Bryant's misunderstanding of the passport application process. According to Defendant, Special Agent Bryant testified that a warrant was necessary to locate the original Wisconsin birth certificate because it was returned to Defendant at the passport office, but according to the passport acceptance clerk, she forwarded the birth certificate to the State Department for processing. Defendant's argument lacks merit. Special Agent Bryant testified that the passport acceptance clerk reviewed Defendant's birth certificate and returned it to him. (Tr. 10-11). Special Agent Bryant based his testimony on the fact that at the bottom of the passport application, there was a notation that Defendant's birth certificate had been seen and returned. (Id.) Linh Yan, the passport acceptance clerk, testified that she forwarded the passport application, a copy of Defendant's driver's license, and his original birth certificate to the State Department. (Tr1. 77). Yan also testified that after processing, the State Department returns the original birth certificate to the individual who applied for the passport. (Tr1. 79). Yan estimated that Defendant's birth certificate would have been returned to him

14

around September or October. (Tr1. 80). Yan further testified that as a passport acceptance clerk, she is not permitted to write in the area at the bottom of the passport application that includes the notation that Defendant's birth certificate had been seen and returned. (Tr1. 78). Even though Special Agent Bryant may have incorrectly recalled the point in which the original birth certificate is returned, the testimony from both Special Agent Bryant and Yan makes it clear that the State Department does not keep original passports. (Tr. 11; Tr1. 79). Notably, Defendant does not come forward with any evidence to show that the original Wisconsin birth certificate was still in the Government's possession, as his argument suggests.

Defendant also makes much of the lengthy period of time that elapsed between the time Special Agent Bryant received Defendant's file and the time Investigator Waites applied for the search warrant of Defendant's home (approximately eighteen months). Defendant argues that absent some evidence of a continuing crime, law enforcement did not have probable cause to believe that relevant evidence would be uncovered. This Court disagrees. "Probable cause must be found to exist at the time the warrant issues." Freeman, 685 F.2d at 951 (internal quotation marks and citations omitted). "Although probable cause may exist at one point to believe that evidence will be found in a given place, the passage of time *may* (without additional newer facts confirming the location of the evidence sought) render the original information insufficient to establish probable cause at a later time." Id. (emphasis added). "[S]taleness is an issue which must be decided on the peculiar facts of each case."

AO 72A
(Rev.8/82)

United States v. Bervaldi, 226 F.3d 1256, 1264 (11th Cir. 2000) (internal quotation marks and citations omitted). The nature of the documents at issue here (e.g., birth certificates, passport records, social security cards, driver's licenses) are such that there was more than a fair probability that such documents would still be present at Defendant's residence at the time the warrant issued. Indeed, it is reasonable to expect that such documents would be kept indefinitely. Also, there was a fair probability that fraud and/or forgery crimes were ongoing. Defendant submitted the fraudulent birth certificate with his passport application in August 2009. However, as stated in the warrant affidavit, Defendant renewed his driver's license in September 2010. To renew a driver's license in Georgia, proof of U.S. citizenship or lawful presence in the United States is required. Therefore, law enforcement agents suspected that Defendant continued to use his fraudulent Wisconsin birth certificate to obtain official documents. Defendant's license renewal in September 2010, was less than six months prior to the time law enforcement obtained the search warrant for his residence. Furthermore, Defendant did not appear to have moved since he applied for the passport application in August 2009. As such, the issuing judge could conclude, with fair probability, that the fraudulent identification documents sought would be present at Defendant's residence when the warrant issued.

Defendant further argues that the Government had more than enough evidence to establish its case against him, such that a search of his residence was gratuitous and unnecessary. Assuming, without deciding, Defendant's argument that a test of necessity

16

applies under the Fourth Amendment, it is clear that the Government has demonstrated necessity. Special Agent Bryant testified that he had not been able to locate the original Wisconsin birth certificate Defendant used or the passport application receipt. These documents were critical to Special Agent Bryant's investigation because often times individuals who are being investigated contend that they were not the person who applied for the passport application. Indeed, Defendant's brother and co-Defendant, made a similar argument. See United States v. Rigaud Cadet, Criminal Action No. 1:11-CR-00113, Doc. 45 (defendant continued to insist, even at a plea colloquy on October 27, 2011, that someone else submitted the passport application at the Fayetteville post office on his behalf, but admitted responsibility on agency theory). Additionally, despite all of the evidence that Special Agent Bryant had assembled, Special Agent Bryant was still unable to conclusively establish that Defendant was not a United States citizen. Although Special Agent Bryant had an application Defendant's mother completed on his behalf, indicating that he was born in Haiti, Special Agent Bryant had not located Defendant's mother, who presumably was in Haiti, to interview her about the application. Defendant also points to the fact that the passport acceptance clerk gave an affidavit identifying him as the person who filed the passport application with her. While it is true that Yan had given an affidavit saying that Defendant was the one who submitted the passport application to her in the post office, (tr. 40-41), there is no evidence in the record that Yan personally knew Defendant such that she could definitely state that the individual who applied for the passport application was in fact

17

Defendant. At most, Yan could testify that based on the documents that were presented to her, the person who applied for the passport application appeared to be Defendant. Thus, the Government has met the necessity showing that Defendant argues applies under the Fourth Amendment.

## B.    The Search Warrant Did Not Lack Particularity

Defendant contends that the language in the search warrant is not particularized enough to meet the requirements of the Fourth Amendment. The Fourth Amendment's Particularity Clause provides that "no [w]arrants shall issue [unless the warrant] particularly describ[es] the place to be searched, and the persons or things to be seized." U.S. CONST. amend. IV. The Particularity Clause protects against the risk of an excessive intrusion into the areas of personal rights ensured Fourth Amendment protection by prohibiting "general, exploratory rummaging in a person's belongings." Coolidge v. New Hampshire, 403 U.S. 443, 467 (1971). Elaborate specificity in a warrant is unnecessary; a search warrant "need only describe the place to be searched with sufficient particularity to direct the searcher, to confine his examination to the place described, and to advise those being searched of his authority." United States v. Burke, 784 F.2d 1090, 1092 (11th Cir. 1986). As "circumstances often make an exact description of the property impossible, in such cases, the issuing judge must weigh the practical necessities of law enforcement against the likelihood of a violation of the personal rights of the individual whose premises and possessions are to be searched." United States v. Cook, 657 F.2d 730, 733 (5th Cir. 1981) ("The use of a generic term or

18

general description in a warrant, however, is acceptable to the judicial officer issuing the warrant only when a more specific description of the things to be seized is unavailable.").

The search warrant states, "[f]or the above reasons, affiant has probable cause to believe that there is now located articles, person(s), or things, namely: Documents, Computers, Printers, ledgers, forgery equipment, government applications, evidence of crimes both Federal and State; obtaining a Drivers License, Passport, Birth Certificates, and Visa[,] Evidence of the crime of forgery- O.C.G.A. § 16-9-2 which is in violation of Georgia Law on the premises, vehicle and/or persons described above." Docket Entry [50-1]. This language is specific enough to guard against a general, exploratory rummaging through Defendant's belongings. As described, the search warrant is limited to the identification documents law enforcement knew or reasonably suspected to be forged or fraudulently obtained and the items reasonably expected to be used to create such documents. Items seized from inside Defendant's bedroom include, a Wisconsin birth certificate and the receipt from his passport application. The Wisconsin birth certificate falls in the category of "Birth Certificates," and the receipt from Defendant's passport application is a "government application."

Defendant argues that the language "certain instruments, articles, or things" and each of the categories in the phrase "documents relating to Forgery, False Statement, fraudulently obtained social security cards, birth certificates, passports, and Georgia drivers licenses" are not sufficiently particularized to pass constitutional muster.

19

However, these terms do not appear in the search warrant and instead appear in the search warrant affidavit and application. The particularity requirement of the Fourth Amendment applies to the search warrant. See United States v. Pratt, 438 F.3d 1264, 1269-70 (11th Cir. 2006) ("[T]he contents of the search warrant itself, not the contents of the supporting documents, are scrutinized under the Fourth Amendment's particularity requirement."). Defendant does not raise any challenge to the specific language of the search warrant itself. Defendant's arguments related to the individual categories of documents (fraudulently obtained social security cards, birth certificates, passports, and Georgia drivers licenses) are more along the lines of probable cause challenges. In Section II.A. supra, the Court has addressed why there was a fair probability for the issuing judge to believe that evidence of fraudulently obtained social security cards, birth certificates, passports, and Georgia driver's licenses would exist in Defendant's residence.

## C.  **The Search Warrant Was Not Overbroad**

Defendant argues that the warrant affidavit was overbroad because it allowed law enforcement to search "the entire residence, and vehicles located at 387 Sawgrass Way, Clayton County, Fayetteville, Georgia 30215," even though Defendant did not own the residence and others lived in the residence. Defendant's argument is unfounded. As an initial matter, Defendant offers no legal authority for his position. Besides, officers could reasonably expect that evidence of forgery by Defendant might be found both inside and outside his bedroom. Therefore, a search of the entire residence was

20

reasonable and not overbroad. See United States v. Rubinstein, No. 09-20611-CR, 2010 WL 2723186, at *9 (S.D. Fla. June 24, 2010) (noting that when there is "every reason to believe that the occupants [are] not restricted to particular rooms within th[e] home[,] [t]here is considerable support for the notion that a search warrant for the entire premises of a single family residence is valid, notwithstanding the fact that it was issued based on information regarding the alleged illegal activities of one of several occupants of a residence." (internal quotation marks and citations omitted)).

## C.   Abandoned Arguments

Defendant made several arguments in his initial Motion to Suppress Search Warrant at 387 Sawgrass Way, Fayetteville, Georgia 30215 that he did not further discuss in his amended/perfected motions.  Specifically, Defendant argued that the Clayton County Superior Court Judge who authorized the search warrant was not a neutral and detached magistrate; there was no evidence that any law enforcement officer, agent of the law, confidential informant, or other person had been in Defendant's residence to observe or hear evidence of a crime in the residence; there was no additional evidence beyond the affidavit in support of the search warrant; there was no legal justification to break down the door and crash into the residence where there was no "no-knock" provision in the search warrant; and the executing officers opened a safe without obtaining a warrant.  Defendant did not perfect or expound upon these arguments in his post-hearing briefs.  As such, this Court deems these arguments to have been abandoned by Defendant. See United States v. Chappell, No.1:10-CR-513-WSD-

ECS, 2011 WL 5353016, at *5 (N.D. Ga. May 25, 2011) (deeming argument defendant raised in pre-hearing motion, but did not expound upon in post-hearing briefs, to be waived and abandoned).

## III.  CONCLUSION

For the foregoing reasons, the undersigned **RECOMMENDS** that Defendant Frederick Cadet's Motion to Suppress Search Warrant at 387 Sawgrass Way, Fayetteville, Georgia 30215 be **DENIED**.  (No. 1:11-cr-00113-WBH-LTW, Docket Entries [46] and [67]; No. 1:11-cr-00522, Docket Entry [8]).  As there are no further motions pending, the undersigned certifies these cases ready for trial.  The clerk is directed to terminate the reference to the undersigned.

**IT IS SO ORDERED AND REPORTED AND RECOMMENDED**, this 16 day of January, 2013.

LINDA T. WALKER
UNITED STATES MAGISTRATE JUDGE

AO 72A
(Rev.8/82)